UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RONALD CERNOHORSKY; and,
IMONI ALI, Individually, and on behalf
of All Others Similarly Situated,
                                     Case No.:
                                     CLASS REPRESENTATION

        Plaintiffs,

v.

CAREER EDUCATION CORPORATION;
and, INTERNATIONAL ACADEMY OF
MERCHANDISING & DESIGN, INC. d/b/a
IADT ONLINE,

        Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs, RONALD CERNOHORSKY and IMONI ALI, Individually, and on behalf of All Others Similarly Situated (hereinafter "Plaintiffs" or "the Class"), bring this class action against the above captioned Defendants, CAREER EDUCATION CORPORATION ("CEC") and INTERNATIONAL ACADEMY OF MERCHANDISING & DESIGN, INC. d/b/a IADT ONLINE ("IADT" or "IADT ONLINE") (hereinafter collectively referred to as "Defendants"), pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Fla. Stat., Federal Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C., §§ 1861-1868, and various other violations of Florida State law to recover damages for unlawful, deceptive and misleading business practices in the State of Florida. In support thereof, Plaintiffs state as follows:

## PRELIMINARY STATEMENT

*"Sunlight is the Best Disinfectant"* – Justice Louis Brandeis

This action seeks to remedy deceptive and systemic practices employed upon unsuspecting college students that is ubiquitous in the for-profit secondary education industry and threatens to leave a generation of students in dire financial straits. The Plaintiffs and the Class seek to bring an element of "sunlight" or transparency to the way Defendants market their schools, particularly IADT ONLINE, by highlighting the representations, and omissions, made to prospective students and the falsity, or misleading nature, of those representations resulting in a generation of students faced with an inadequate education and a financial debt burden under which they will never be able to surmount. By blatantly misrepresenting and manipulating its employment statistics, providing an inadequate education and making false and misleading representations and omissions, Defendants have essentially ruined the future of the Plaintiffs and the Class for the sake of reaping untold millions of dollars in profits. These deceptions are perpetuated so as to prevent prospective students from realizing the obvious – that attending IADT and financing tens of thousands of dollars in tuition payments (of even $100,000.00) is a terrible investment which makes little economic sense and, most likely, will never pay off. Some students finish with loan balances of $100,000.00 to $190,000.00, co-signed by parents and leaving many families with ruined credit and in financial crisis. The Plaintiffs and the Class attended IADT ONLINE with the goal of attaining the kind of career commensurate with and worthy of the enormous time, money and personal sacrifice invested in a college education. The Plaintiffs and the Class relied upon Defendants' representations in choosing to attend IADT ONLINE.

However, on May 17, 2011, CEC announced that it had received a subpoena from the Attorney General of the State of New York requesting documents pertaining to its school placement rates as a result of an investigation into whether it had complied with New York state consumer protection, securities, finance, and other laws. On November 1, 2011, CEC reported that it had retained outside counsel to conduct an internal investigation which found the "existence of improper placement determination practices" and that its Art and Design schools "lacked sufficient supporting documentation or otherwise did not meet applicable placement guidelines established by the Company." During an earnings call that same day CEC's Chief Executive Officer, Steven Lesnik, stated:

> "We have uncovered what were going to be recorded as placements were
> not genuine placements, according to our standards."

On May 5, 2012, IADT ONLINE's accrediting agency, the Accrediting Council for Independent Colleges and Schools ("ACICS"), placed it on probation due to job placement rates that did not meet the standards set by ACICS. Plaintiff alleges that Defendants knew about these improper practices, conspired to perpetuate these fraudulent and misleading practices upon its students, and their accrediting agencies, and took advantage of a vulnerable population of society in order to continue receiving Title IV funding at the expense of its students. Defendants preyed upon, and took advantage of, the trust placed in their hands by these prospective students, and the Plaintiff and the Class now seek to vindicate their interests through the court system.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction of the causes of action set forth in this

Complaint pursuant to the Class Action Fairness Act of 2005. 28 U.S.C. 1332(d).

2.    Venue is proper to this Court pursuant to 28 U.S.C. 1391(b)(2) and Fla. Stat. §47.011, because a substantial part of the events or omissions giving rise to the Plaintiffs' claims took place in Hillsborough County at Defendants' Tampa campus located at 5104 Eisenhower Blvd., Tampa, FL 33634.

## PARTIES

### The Plaintiffs

3.    Plaintiff, RONALD CERNOHORSKY enrolled at IADT's Tampa Online campus from January of 2011 through approximately December of 2012 to pursue an Associates of Science Degree in Information Technology.

4.    Plaintiff, IMONI ALI enrolled at IADT's Tampa Online campus from January of 2010 through August of 2012 to pursue a Bachelors of Fine Arts in Graphic Design.

### The Defendants

5.    Defendant, CAREER EDUCATION CORPORATION, is a Delaware corporation with its principal offices located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, IL, 60169. CEC operates 'for profit' colleges throughout the country. CEC is one of the largest publicly-traded companies offering "for-profit" educational services to students, primarily through "online" Internet schools. CEC is the parent corporation of a business enterprise, owning, operating and managing upwards of eighty for-profit colleges and trade schools, including the International Academy of Design & Technology and Sanford-Brown Institutes and Colleges, with approximately 116,000 enrolled students throughout the United States, Canada, France and the United Kingdom.

6.     Defendant, INTERNATIONAL ACADEMY OF MERCHANDISING & DESIGN, INC. is a Florida corporation with its principal offices located at 231 N. Martingale Road, Schaumburg, IL, 60173.   The INTERNATIONAL ACADEMY OF MERCHANDISING & DESIGN, INC. is a wholly owned subsidiary of CEC, and is the registered owner of the Fictitious Name, IADT Online.

7.     IADT ONLINE is a 'for profit' educational institution that offers online courses to IADT ONLINE students via a virtual campus.

8.     At all times relevant to this suit, Defendants were so intertwined as to render the corporate segmentation between them a sham.   Thus, a person allegedly acting as an agent of only one of the Defendants was in fact acting as an agent for both Defendants.

9.     Upon information and belief, Defendant, CEC, develops and oversees the implementation of all policies and procedures at IADT ONLINE, including without limitation policies and procedures concerning admissions policies, financial aid practices, curriculum, and job placement.   Defendant, IADT ONLINE, then implements and carries out the policies and procedures developed and imposed by CEC.   Throughout all their activities, CEC and IADT ONLINE acted as alter egos of one another.

### CLASS ACTION ALLEGATIONS

10.     Pursuant to Fed. R. Civ. P. 23(a), the named Plaintiffs seek class certification and is a member of the following Class he seeks to represent:   All students who are or have enrolled in Defendants' degree programs at IADT ONLINE during the relevant time period.

11.     This action is properly maintainable pursuant to Fed. R. Civ. P.

23(b)(1)(a) because prosecuting separate actions by or against individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

12.     This action is also properly maintainable pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) because the party opposing the class has action or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Furthermore, the questions of law or fact common to the Class members predominate over any question of law or fact affecting only individual members of the Class. The predominant questions of law or fact are clear, precise, well-defined, and applicable to each named Plaintiff as well as every absent member of the proposed Class.

13.     Class representation is also superior to other available methods for the fair and efficient adjudication of the controversy for a number of reasons, including, but not limited to, the following: (1) the case challenges the policies of a school and many students may be reluctant to bring claims individually for fear of retaliation; (2) class members do not have the resources to bring their claims individually; (3) prosecution of separate claims by individual members of the Class would create a risk of inconsistent adjudications which would establish incompatible standards of conduct for Defendants; and (4) it would be an inefficient use of scarce judicial resources to require each student

affected by the practices challenged herein to bring his or her own individual claim.

14.    Numerosity: This action satisfies numerosity.   The class defined in paragraph 10 is sufficiently numerous that separate joinder of each member is impracticable as the class will be comprised of up to 1,000 or more absent Class members.

15.    Commonality: The named Plaintiff's claims raise questions of law and fact common to each member of the Class, which include, but are not limited to:

a)    Whether students enrolled at IADT ONLINE received the proper training and instruction as was represented to them;

b)    Whether Defendants induced and misled students to enroll at IADT ONLINE by using misrepresentations, fraudulent claims and/or omissions of material facts regarding the quality of an IADT ONLINE education and future career prospects;

c)    Whether Defendants omitted and concealed information and failed to provide prospective students with full disclosure of material facts in marketing IADT ONLINE; including, but not limited to, costs, loan interest rates, and default rates;

d)    Whether the methods of marketing, selling and targeting individuals predisposed to fail or having a history of cognitive or other problems is unfair, unconscionable or deceptive;

e)    Whether Defendants deceived the Accrediting Council for Independent Colleges and Schools ("ACICS")[1] and the general public by providing and/or publishing false and inaccurate information related to placement rates within the

_____

[1] ACICS is a national accrediting organization of degree-granting organizations.

field of study to achieve national accreditation; and

      f)      Whether Defendants' conduct violated FDUTPA.

      g)      Whether Defendants' conduct violated RICO.

16.    <u>Typicality</u>: The claims of the named Plaintiffs are typical of the claims of the Class members because the Plaintiffs were students enrolled at IADT ONLINE in justifiable reliance of Defendants' misrepresentations.

17.    <u>Adequacy</u>: The named Plaintiffs will vigorously pursue the claims alleged herein on behalf of themselves and other students similarly situated. The named Plaintiffs' claims have no adverse interests to the proposed absent Class members because he asserts the same claims and seeks the same relief as would the absent Class members if each were to bring a similar action individually. The named Plaintiffs will adequately protect and represent the interests of each absent Class member. Counsel who brings this action for the named Plaintiffs and proposed Class are experienced in class action practice and procedure.

## I.    **Background**

18.    Upon information and belief, the continued violations of FDUTPA under Chapter 501, Florida Statutes, complained of herein, have been practiced and imposed upon all students whom enrolled in the information technology programs at IADT ONLINE and present questions of law and/or fact that are common to the claims of the Plaintiff and of each member of the Class.

19.    Defendant, CEC, enrolls over 100,000 students in campuses throughout the world with nearly 40% attending web-based virtual campuses.

20.    CEC dictates policies, procedures, and methods of operation such as

admissions, career services, and placement reporting methods to its subsidiary schools, including IADT ONLINE.

21.     CEC, like many for-profit education companies, receives the bulk of its revenue from taxpayers via federal student aid programs reauthorized under Title IV of the Higher Education Amendments of 1992.[2]

22.     The federal government, through Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.*, administers billions of dollars in student financial assistance to students at both non-profit and for-profit educational institutions. When students default on the federal student loans, the federal government and the U.S. taxpayers are responsible for the bill. While students at for-profit institutions represent only 9% of all college students, they receive roughly 25% of all Federal Pell Grants and Loans, and are responsible for 44% of all student loan defaults. Based on the disproportionate percentage of student loan defaults associated with for-profit educational institutions, the federal government instructed the United States General Accounting Office ("GAO") to investigate for-profit colleges.

23. Institutions receiving Title IV funding are required to meet certain regulations, including a limit on the ratio of government loan funds to cash revenue (the "90/10 Rule"), limits on the percentage of their student borrowers who default on these loans (the "Cohort Default Rate"), and must be accredited by a national accrediting organization certified by the Department of Education. *See* 20 U.S.C. §§ 1001, 1094(a)(21), and 1099(j).

---

[2] About 82% - or $1.7 billion – of CEC's tuition revenue in 2010 came from federal financial aid sources according to the company's annual report.

24.     In order to be accredited, a school must demonstrate to the accreditation agencies that it is in compliance with certain minimum standards including, *inter alia*, achieving certain Placement Rates for its graduates and certain retention rates.  Placement Rates generally may only take into account graduates whose jobs required the degree they received.

25.     In or about April of 2007 Defendants, through their agents, officers and directors, violated federal and state laws regarding Defendants' compliance with Title IV, recruitment of students, representations made by CEC to students and the public regarding student repayment rates and job placement.

26. To continue receiving federal money, Defendants engaged in unfair, unconscionable, and deceptive practices with the goal of getting as many students enrolled into its programs as possible by, among other things, representing that IADT's retention rates and Placement Rates were higher than they actually were.

27.     Defendants also falsely maintained that CEC maintained adequate internal controls when, in fact, Defendants knew that such controls were materially deficient.

28.     The lack of adequate internal controls has caused Defendants to violate federal and state laws governing operation of the Defendants' schools, including IADT ONLINE, which has cost the Defendants millions of dollars and subjected them to multiple lawsuits.

29.     On August 3, 2010, the GAO issued a report concluding that for-profit educational institutions, like CEC, had engaged in an illegal and fraudulent course of action designed to recruit students and over-charge the federal government for the cost of such education.

30.     On August 13, 2010, the U.S. Department of Education ("DOE") released data showing estimated student loan repayment rates.     Under the DOE's proposed "gainful employment" rule, for-profit educational providers would fully qualify for federal aid in one of two ways: either more than 45% of their former students are paying off principal on loans, or the debt burden of former students is below 8% of total income or below 20% of discretionary income.     Accordingly, schools are eligible for federal loans if they prepare their students for "gainful employment in a recognized profession" under the Higher Education Act of 1965.     However, schools lose eligibility if repayment rates are below 35% or debt burden is above 12% of total income and 30% of discretionary income.

31.     For CEC, the DOE data showed that many of CEC's schools had loan repayment rates of less than 20% and at other campuses the rates were less than 10%.     As a result, analysts downgraded CEC's securities to "hold" from "buy" citing CEC's "lower-than-feared" repayment rates.

32.     Following the GAO's August 3, 2010 report, a Congressional Committee launched an investigation of such practices.     The DOE released data showing that the loan repayment rates for CEC enrollees were well below the level required for federal loan program eligibility.     Further, CEC disclosed that its enrollee default rates had significantly increased.

33.     To maintain their accreditation, and continue receiving Title IV funding, which is Defendants' principal stream of revenue, Defendants took advantage of a population of students that were immigrants, had criminal records, had poor academic records, or were just naïve about Defendants' true intentions.

34.     Many of the students that Defendants marketed to were seventeen and eighteen year old children who did not understand, nor did Defendants explain to them, the consequences of the choices they were making by financing tens of thousands of dollars to attend IADT ONLINE.

35.     Worse still, Defendants knew that they were subjecting the students that they fraudulently induced into enrolling at IADT ONLINE to a lifetime of insurmountable debt without any hope of finding the types of jobs or earning the salaries that they were promised.

36.     Defendants knew, but failed to tell the students they were enrolling, including the Plaintiffs, that: (1) the student loan debt was not dischargeable in bankruptcy; (2) that the credits they earned at IADT ONLINE were not transferrable to other post-secondary schools; (3) that IADT ONLINE was not a regionally accredited institution; and (4) that graduates of IADT ONLINE, if they were fortunate enough to find employment, were not earning the type of income sufficient to justify incurring the student loan debt they needed to attend IADT ONLINE.

37.     Defendants treated Plaintiffs, and those similarly situated, as profit centers in which they extracted as much tuition revenue as possible from the students and when they couldn't squeeze out another cent they simply discarded those students who were either left with a worthless degree or no degree at all.

38.     To achieve its goals of profitability, Defendants fostered a culture of deception and outright lies at its schools where their only goal was to reap profits by getting as many students enrolled as possible.

39.     In the aftermath of its lies and deception Defendants left hundreds of

thousands of students ill-equipped to compete in a modern world and saddled with hundreds of thousands of dollars in student loan debts.

## II.    IADT Online

40.    Defendants advertise IADT ONLINE's virtual campus as an education "designed to enable your education to be a collaborative, focused effort led by instructors who have real-world experience in the fields they teach." IADT also asserts that at IADT ONLINE "we're focused on preparing students with the education and confidence they need to pursue their potential in dynamic fields like graphic design, Web design and development, retail merchandise management, Internet marketing, digital media production, and more. We train students to become creative problem-solvers with an industry-current understanding of how things work today and the foresight to imagine the possibilities of tomorrow."

41.    IADT advertises its virtual classrooms as "very interactive and are delivered via rich, multimedia presentations with capabilities designed to give you complete control over your learning experience.  At IADT, you will be taught using the latest technology by instructors who are also professionals in the fields they teach."

## III.    Allegations Specific to IADT Online's Information Technology Program and Plaintiff, Ronald Cernohorsky

42.    IADT advertises its Associate of Science in Information Technology On-Line Program as offering "focused training in the fundamentals of networking technology, PC troubleshooting, applications, operating systems, and more."  IADT furthers states in its advertising that "[t]hrough a variety of hands-on training opportunities, you can learn the fundamentals of networking technology for local area networks (LANs) and wide area

networks (WANs) as well as a variety of programming concepts."

43.      Defendants' representations to Plaintiff, Ronald Cernohorsky, and the Class members, included, but were not limited to:

a)      A student with an information technology degree from IADT ONLINE will earn an annual salary of at least $50,000.00 up to $100,000.00;

b)      IADT's job placement rate is anywhere from 70%-90%;

c)      Teachers at IADT ONLINE are qualified to teach their respective courses and have the educational background, experience in the field, knowledge and competence to teach courses at IADT ONLINE;

d)      IADT ONLINE is an "accredited" school in which students are able to transfer credits earned at IADT ONLINE to other schools including state or regionally accredited colleges or universities offering bachelor and graduate degrees;

e)      IADT ONLINE provides the latest, updated equipment, software and technology for students to use and students are able to transfer those skills into the jobs they will obtain after graduation;

f)      IADT ONLINE's career services department will assist students to find jobs in their respective fields of study;

g)      IADT ONLINE is a prestigious school that carefully selects the students for enrollment at IADT;

h)      A degree from IADT ONLINE is required in order to obtain a job in the field of information technology.

44.      Defendants aggressively marketed IADT ONLINE through an extensive advertising campaign that included television, radio, print, Internet, and direct mail

advertisement and in-person recruitments.

45.    Defendants induced the Plaintiff, Ronald Cernohorsky to enroll at IADT ONLINE through a pattern of partial truths, misleading statements, significant omissions, assertions of fact that it had no reasonable ground for believing to be true, and misrepresentations, all of which were designed to create, in the mind of the Plaintiff, and the Class, the strong impression that he would be both professionally and financially better off if he attended IADT ONLINE.

46.    The representations depicted in Paragraph 43 were materially false and/or misleading.  Defendants knew these representations were false and/or misleading and/or had no reasonable grounds for believing them to be true.  Moreover, in the alternative, Defendants only partially disclosed facts regarding the quality, prestige, and marketability of an education from IADT ONLINE and failed to disclose other more accurate facts necessary to prevent the foregoing representations from being misleading.

47. Despite the picture painted by IADT ONLINE of a first-class education and promising career prospects, the Plaintiff, Ronald Cernohorsky, found the reality far from what was promised to him.

48.    Mr.  Cernohorsky  was  not  provided  knowledgeable,  experienced instructors as was promised to him.

49.    At least one of Plaintiff's instructors taught his online courses on a beach in Florida, was incoherent during many of lectures, and did not have the ability to adequately teach information technology courses.

50.    Defendants falsely represented to the Mr. Cernohorsky that he would be taught the fundamentals of information technology which would provide him with the

necessary skills and knowledge to obtain a job as a networking and information technology professional.

51.    Mr. Cernohorsky did not receive adequate instruction to adequately learn the fundamentals of information technology as he was not provided with computers in which to apply any of the skills needed to be a networking and information technology professional.

52.    Mr. Cernohorsky was misled to believe that he would be taught everything he needed to learn about information technology through IADT ONLINE's interactive courses.

53.    However, many of the information technology courses taught by IADT ONLINE, such as troubleshooting courses, cannot adequately be taught without hands-on instruction on a computer.

54.    Many schools offering similar information technology courses, such as Hillsborough Community College, refuse to teach troubleshooting, upgrade and repair, and security installation courses on-line because, without hands-on instruction on an actual computer and/or the use of special equipment, a student cannot be adequately taught.

55.    Because Mr. Cernohorsky enrolled in IADT ONLINE's information technology program and was not provided hands-on training on a computer he is ill-equipped to begin a career in information technology.

56.    Defendants knew that many of the businesses hiring in the information technology field required employees to have experience working with a computer and that without that experience graduates and former students of IADT ONLINE would not

be hired for such positions.

57.     Because of his inadequate training, Mr. Cernohorsky is intimidated to apply for jobs in the information technology field because he has no experience whatsoever performing any of the skills needed to be an information technology professional.

58.     In addition to not providing training on a computer, Defendants' online courses are five (5) weeks long with only two (2) hours of actual virtual classroom time per week which is not enough time to grasp and learn the course materials and to become a competent, knowledgeable, and employable information technology professional.

59.     Defendants falsely represented to Mr. Cernohorsky that they would be able to assist him in finding a job before or after graduating from IADT ONLINE.

60.     Defendants do not provide students with any meaningful assistance in finding employment and do not have an extensive network of contacts and close relationships with employers.  Rather, most students of IADT ONLINE find jobs solely as a result of their own efforts.

61.     Mr. Cernohorsky was misinformed about the costs of enrolling in IADT and, although he was told that his associates degree would cost $31,000.00, Defendants raised his tuition to $46,000.00 after he had attended IADT ONLINE for almost two (2) years.

62.     The increase in tuition and costs by IADT ONLINE were unanticipated and unexpected and, because Mr. Cernohorsky's student loans and grants did not cover the increased tuition and costs, he was forced to withdraw from IADT ONLINE.

63.     Defendants falsely represented to Mr. Cernohorsky that he would be able

to transfer credits earned at IADT ONLINE to other colleges and universities to pursue a

bachelor or graduate degree.

64.     After Mr. Cernohorsky could no longer attend IADT ONLINE because of

the increase in tuition and costs, he attempted to transfer his credits earned at IADT ONLINE to

other colleges and universities.

65.     However, no post-secondary school would accept the credits that Mr.

Cernohorsky earned at IADT ONLINE because of IADT's poor reputation and lack of

regional accreditation.

66.     Upon information and belief, the above described misleading acts, false

representations and material omission were perpetrated upon all similarly situated

individuals who enrolled in IADT ONLINE's information technology programs.

**IV.    Allegations Specific to IADT Online's Graphic Design Program and Plaintiff, Imoni Ali**

67.     IADT advertises its Graphic Design Program as "professionally-focused to help

students pursue their interests.  At our schools, students will be challenged to examine

complex, multifaceted commercial design problems and explore how to develop dynamic

and innovative solutions."

68.     Defendants' representations to Plaintiff, Imoni Ali, and the Class

members, included, but were not limited to:

a)      Teachers at IADT ONLINE are qualified to teach their respective

courses and had the educational background, experience in the field, knowledge and

competence to teach courses at IADT ONLINE;

b)      The cost of attending IADT ONLINE is less than the cost of other

post-secondary schools offering similar degree programs;

     c)     IADT ONLINE is an "accredited" school in which students are be able to transfer credits earned at IADT ONLINE to other schools including state or regionally accredited colleges or universities offering bachelor and graduate degrees;

     d)     IADT ONLINE provides the latest, updated equipment, software and technology for students to use and students would be able to transfer those skills into the jobs they would obtain after graduation;

     e)     IADT ONLINE's career services department will assist students to find jobs in their respective fields of study;

     f)     IADT ONLINE is a prestigious school that carefully selects its students for enrollment.

69.     Defendants aggressively marketed IADT ONLINE through an extensive advertising campaign that included television, radio, print, Internet, and direct mail advertisement and in-person recruitments.

70.     Defendants induced the Plaintiff, Imoni Ali, to enroll at IADT ONLINE through a pattern of partial truths, misleading statements, significant omissions, assertions of fact that it had no reasonable ground for believing to be true, and misrepresentations, all of which were designed to create, in the mind of the Plaintiff, and the Class, the strong impression that she would be both professionally and financially better off if she attended IADT ONLINE.

71.     The representations depicted in Paragraph 68 were materially false and/or misleading. Defendants knew these representations were false and/or misleading and/or had no reasonable grounds for believing them to be true. Moreover, in the alternative,

Defendants only partially disclosed facts regarding the quality, prestige, and marketability of an education from IADT ONLINE and failed to disclose other more accurate facts necessary to prevent the foregoing representations from being misleading.

72.     Despite the picture painted by IADT ONLINE of a first-class education and promising career prospects, the Plaintiff, Imoni Ali, found the reality far from what was promised to her.

73.     Ms. Ali was misinformed about the costs of enrolling at IADT ONLINE and, although she was told that her bachelors degree in graphic design would cost $63,000.00, IADT ONLINE raised her tuition to $73,000.00 after she had attended IADT ONLINE for approximately six (6) months.

74.     The increase in tuition and costs by IADT ONLINE were unanticipated and unexpected and, because Mr. Ali's student loans and grants did not cover the increased tuition and costs, she was forced to stop attending IADT full-time and reduced her course load to part-time until she finally had to withdraw from IADT ONLINE.

75.     Defendants falsely represented to Ms. Ali that she would be able to transfer credits earned at IADT ONLINE to other colleges and universities to pursue a bachelor or graduate degree.

76.     After Ms. Ali could no longer attend IADT ONLINE because of the increase in tuition and costs, she attempted to transfer her credits earned at IADT ONLINE to other colleges and universities which refused to accept any transfer credits from IADT ONLINE.

77.     No post-secondary school accepts the credits that Ms. Ali earned at IADT ONLINE because of its poor reputation and lack of regional accreditation.

78.     Upon information and belief, the above described misleading acts, false

representations and material omission were perpetrated upon all similarly situated individuals who enrolled in IADT ONLINE's degree programs.

## V.   General Allegations Applicable to the Plaintiffs and the Class

79.   This action arises out of a fraudulent scheme conceived and operated by Defendants in connection with the recruitment of their students.

80.   Defendants induced Plaintiffs and the Class to apply to and enroll at IADT ONLINE by making one or more, and in many cases all, of the following false and fraudulent representations:

a)   A graduate of IADT ONLINE will earn an annual salary of at least $50,000.00 up to $100,000.00;

b)   IADT's job placement rate is anywhere from 70%-90%;

c)   Teachers at IADT ONLINE are qualified to teach their respective courses and have the educational background, experience in the field, knowledge and competence to teach courses at IADT ONLINE;

d)   IADT ONLINE is an "accredited" school in which students are able to transfer credits earned at IADT ONLINE to other schools including state or regionally accredited colleges or universities offering bachelor and graduate degrees;

e)   IADT ONLINE provides the latest, updated equipment, software and technology for students to use and students are able to transfer those skills into the jobs they will obtain after graduation;

f)   IADT ONLINE's career services department will assist students to find jobs in their respective fields of study;

g)   IADT ONLINE is a prestigious school that carefully selects the

students for enrollment at IADT;

h)      A degree from IADT ONLINE is required in order to obtain a job in a student's respective field of study;

i)      An IADT ONLINE education can be financed through student loans that IADT ONLINE will arrange for the benefit of the student and with a resulting debt service burden that is reasonable and manageable in light of the income opportunities available to graduates.

81.      It was, and is, the custom and practice of Defendants to make these representations to recruit each prospective applicant and induce them to attend IADT ONLINE in reliance thereon.

82.      The true facts are as follows.  Admission to IADT ONLINE is not at all selective, but is open to virtually anyone who can pay the tuition (and almost all applicants pay via student loans).   Graduation from IADT ONLINE is virtually guaranteed as long as students pay and almost no one fails out of IADT ONLINE even if they do not attend virtual classes regularly or learn the skills or obtain the knowledge the programs are supposed to teach.

83.      An education from IADT ONLINE does not significantly increase graduates' incomes and opportunities and/or does not increase them to an extent that makes the high cost of an IADT ONLINE education worth the tuition.  A degree from IADT ONLINE does not inspire confidence in the minds of prospective employers and is frequently a detriment to graduates because of the bad and worsening reputation of IADT ONLINE.

84.      Few graduates of IADT ONLINE are hired by prestigious employers and,

in fact, most IADT ONLINE graduates have a difficult time finding any job at all in their field of study.  Many employers will not hire IADT ONLINE graduates because of the poor quality of education that IADT ONLINE students receive and the absence of selectivity and exclusivity in the admissions process.

85.     Defendants were aware that the placement rates it was representing to its students were false and that its employees were falsifying placement leads in order to meet their required placement requirements for accreditation with ACICS.

86.     Defendants knew that regionally accredited colleges and universities, and all state schools, do not accept credits from nationally accredited schools, including IADT ONLINE.

87.     Defendants knew that it would be unable to place students in their fields of study at the same placement rates they represented to prospective students.

88.     Defendants falsely represented that IADT had a prestigious reputation and that its graduates were "highly sought after by employers."

89.     To cover the approximately $31,000.00 to $69,300.00 cost of IADT ONLINE's degree programs, virtually all of IADT's students had to borrow money, mostly with high and variable interest rates upwards of 13%, with loans specifically arranged by IADT without disclosure to students.

90.     Defendants failed to disclose the true cost of its Programs by not informing prospective students of the additional costs of attending IADT ONLINE which included, among other things, an additional $10,000.00 in fees for books.

91.     Defendants intentionally failed to disclose the true costs of their Programs as Defendants' marketing strategy is to divert prospective students from learning the true

facts regarding what their debt load will be after they graduate.

92.    By failing to inform prospective students of the true cost of an IADT ONLINE "education" and arbitrarily increasing its tuition costs, solely to reap greater profits, Defendants have removed the Plaintiffs' ability to make an informed and knowledgeable decision regarding whether an IADT ONLINE "education" is worth the investment.

93. Defendants falsely represented its academic programs as a good investment despite the fact that it knew that the default rate on student loans for its graduates within three (3) years of graduation is well over 50%.

94.    Defendants failed to explain to prospective students how interest rates affect their loan payment schedule, the amount of monthly payments they would likely be required to pay once they graduated, or the concept of compound interest.  Rather, Defendants' representatives told students not to be concerned about the high loans, as they would get good jobs and be able to pay off the loans without a problem.

95.    Defendants failed to disclose to prospective students the average monthly payment schedule for their student loans and that graduates of IADT ONLINE suffer from high debt-to-income ratios and higher rates of default than graduates of traditional, non-proprietary colleges and universities around the county, including Florida.

96.    The amount of debt Defendants told students they would incur after graduating from IADT was rarely correct and many students came to learn that their loan debt was substantially higher than what IADT had represented to them.

97.    In 2009, IADT ONLINE became accredited by the Accrediting Council for Independent Colleges and Schools.

98.    Despite its accreditation, credits earned from IADT ONLINE are not transferrable to other colleges and universities and, as a result, the Plaintiffs, and those similarly situated, could not transfer the credits they earned at IADT and were trapped insofar as they were left with no real choice but to either continue incurring the additional costs, and spending the additional time, to complete their degrees at IADT, or drop out without a degree while still being burdened with an insurmountable amount of student loan debt.

99. Many students, after incurring tens of thousands of dollars in student loan debt, and realizing that they could no longer afford the recurring tuition increases at IADT ONLINE, were forced to drop out of school.

100.    As a result, students are left with tens of thousands of dollars in student loan debt without having earned a degree; with credits that are not transferrable; and without the skills needed to obtain a job in the information technology field.

101.    Defendants, at all relevant times, knew that the average loan rate for their students would bear interest in a range of 10% to 13%, and that upon graduating, most IADT students would not be able to afford the monthly debt service on these loans with the $8.00 per hour menial labor jobs they could expect to work at.

102.    The loans that Defendants help students secure are offered at rates that are not competitive and result in a debt service burden that is unreasonably high in light of the lack of job opportunities available to IADT ONLINE graduates at income levels suitable to repaying these loans.

103.    Defendants knew that students who applied and received financial aid could only incur a certain level of student loan debt before they would be denied any

further student loans without obtaining a co-signer.

104.    After five years, collection charges and other fees and penalties frequently push this debt to over $100,000.00 and, in some cases, $200,000.00.

105.    As student loans are not dischargeable in bankruptcy absent exceptional circumstances, many of the student who attend IADT ONLINE may never be able to buy a house, obtain credit cards, rent a car, or borrow money for education.

106.    When during the enrollment process prospective students asked whether they could expect to service and then pay off their loans taken out to attend IADT ONLINE within a reasonable period of time, they were told "yes."

107.    Even if Plaintiff or the members of the Class graduate, they will receive a degree that is effectively worthless to them, ending up at best, with jobs that they could have obtained without a degree from IADT.

108.    Defendants' students are consequently saddled with non-dischargeable student loans that they cannot repay or service that greatly increase upward due to capitalization and staggeringly high interest rates such as 13%, creating a condition of lifelong financial ruin.

109.    Defendants did not disclose to Plaintiffs and the Class that their placement rates included students who had worked for only one day and did not involve jobs related to their program of study.

110.    Upon information and belief, the placement rates are calculated by CEC upon information provided by employees of IADT. These employees, however, simply make up rates without any research or supporting documentation, with full knowledge that such rates will be relied upon by prospective and current students.

111. Defendants knew that its employees were falsifying placement records and were failing to disclose the true placement rates to prospective students.

112. As part of its policies and practices, Defendant, CEC, through its management and personnel, forces its schools, including IADT ONLINE, to report placement rates that are unrealistic and unachievable and knew that its admissions representatives had to manipulate the placement rates in order for them to meet their sales quotas and keep their jobs.

113. Defendants' quota-driven admissions representatives, pursuant to Defendants' policies, were directed to methodically avoid discussing the true facts and figures with prospective students. If prospective students raised the issues, the quota-driven admissions representatives lied, changed the subject, or knowingly misled the prospective students.

114. Defendants trained their admissions representatives to establish a personal rapport with prospective students on the belief that it is easier to walk away from an institution than from a relationship so as to give rise to a consulting relationship of trust and confidence while failing to disclose that they were operating under the conflict of interest between the students' interests and their own interest in Defendants' mandatory sales quotas, goals and targets that could cause them to be terminated if those sales quotas, goals and targets were not met.

115. CEC fostered an atmosphere of misrepresentations and outright lies to meet ACICS' placement protocols by self-reporting placement figures to ACICS that were not based upon any sort of independent evaluation but by its own school reports.

116. Nonetheless, Defendants knew that IADT was falling short of ACICS'

accreditation placement requirement of 65% which put its accreditation with ACICS in doubt.

117.    Defendants knew that its three-year cohort default rates[3] for graduates of IADT were well over the national average for for-profit secondary schools of 22.7%.

118.    Defendants had an incentive to misrepresent its students' default rates because colleges with high cohort default rates can lose eligibility for federal student aid programs pursuant to Section 401(j) of the Higher Education Act of 1965 which specifies that a college is no longer considered an eligible institution based on high cohort rates for federal education loans.

119.    Section 435(a)(2) of the Higher Education Act of 1965 suspends eligibility for the Federal Family Education Loan Program ("FFEL") loans for the remainder of the current fiscal year and the two following years for any college with a cohort default rate of greater than or equal to 25% for three years in a row.

120.    The regulations at 34 CFR 668 subpart M states the loss of federal student loan eligibility as follows:

a)      34 CFR 668.187(a)(1) lose eligibility for FFEL and the William D. Ford Federal Direct Loan Program ("DL") loans if the cohort default rate is greater than 40% in a single year;

b)      34 CFR 668.187(a)(2) lose eligibility for FFEL and DL loans and Pell Grants if the cohort default rate is greater or equal to 25% for each of the three most recent years; and

c)      34 CFR 668.187(b) the loss of eligibility is for the remainder of the

---

[3] The cohort default rate is a ratio of the borrowers defaulting to the total number of borrowers.

current fiscal year and next two fiscal years if not successfully appealed.

121.   On September 28, 2012, the DOE released its official 2009 three-year federal student loan cohort default rates which shows that IADT – Tampa had a three-year cohort default rate of 26.9% for fiscal year 2009, as well as an overall graduation rate of 26%, putting it at risk of losing eligibility for Title IV funding.

122.   Defendants knew that IADT's students were defaulting at a rate of greater than 25% for at least three years in a row and that its eligibility for Title IV funding was in jeopardy yet failed to disclose this information to its students who were at risk of not being able to complete their degree programs due to their failure to obtain federal student loans.

123.   On November 1, 2011, CEC's Chief Executive Officer, Gary E. McCullough, announced his resignation the day before CEC disclosed that an internal investigation had determined the company had inflated its job placement rates in order to meet accreditors' minimum standards.

124.   These practices of reporting inaccurate placement figures were confirmed in late 2011 when CEC alerted its investors and financial analysts that it found that some of its schools had engaged in "improper practices" in calculating their job placement numbers.

125.   In November of 2011, CEC revealed, in a Securities and Exchange Commission filing, that an outside law firm it hired to review the determination of student placement at its more than 80 campuses around the United States found the "existence of improper placement determination practices" and that its Art and Design schools "lacked sufficient supporting documentation or otherwise did not meet applicable placement guidelines established by the Company."

126.    In light of these findings, CEC revised the 2010-2011 job placement numbers for forty-nine ("49") schools involved and discovered that only thirteen ("13") of them have actual rates high enough to meet ACICS' minimum standard of 65%.

127.    Pursuant to IADT's mandatory disclosures as mandated by the U.S. Department of Education, IADT's Tampa campus had an actual employment rate of 63.7% and an extrapolated rate of 56.5% for graduates from IADT's Tampa campus in 2011.[4]

128.    On May 5, 2012, ACICS placed IADT ONLINE on probation due to job placement rates that did not meet the expectations of ACICS.

129.    Because of the dismal employment rates of its graduates, IADT pressured its admissions counselors to inform prospective students that its placement rates were anywhere from 80%-98% within six (6) months of graduation which was unrealistic and impossible to achieve.

130.    The placement rates of 80% - 98% are far removed from the actual employment rates reported by IADT after it learned about its "improper practices."

131.    The placement rates provided by Defendants were false and misleading in that they counted a student as "placed" for purposes of its placement rates irrespective of the type of position a graduate obtained. For instance, Defendants considered a graduate "placed" if they obtained any position regardless of the length of employment, even if it was for one (1) hour, whether it was paid or unpaid, whether it was part-time or

---

[4] These employment rates were verified by outside independent counsel after CEC found that "improper practices" with regard to calculating its placement rates. The "actual" rate is calculated from employment information provided by IADT's 2011 cohort after a statistically valid sample of those graduates' employment information was verified by outside independent counsel. The "extrapolated" rate is based upon extrapolating the experience of the verification of that sample to the full 2011 cohort of the school.

"freelance," whether it was a menial, minimum wage job or whether it was outside of their field of study.

132.    Because the Plaintiffs and the Class reasonably understood these placement rates to refer to jobs in their respective fields of study with salaries commensurate with what was represented to them, the placement statistics were grossly false and misleading.

133.    Through their false or misleading representations and/or omissions, Defendants induced the Plaintiffs and the members of the Class to enroll in its online degree programs and take out loans that Defendants knew could not be paid back.

134.    Defendants were on notice at all relevant times that their false representations and omissions regarding its placement rates, expected job prospects, earning capacity and IADT's accreditation were being communicated to prospective students by their employees who were then rewarded for deceiving prospective students and inflating its enrollment numbers.

135.    Furthermore, CEC's policies and practices of intentionally and fraudulently publishing misleading placement rates were applied in a highly standardized manner to all of its for-profit secondary schools, including IADT ONLINE.

136.    These same policies and practices employed by CEC at IADT ONLINE and other for-profit secondary schools have led to other lawsuits filed against it.[5]

137.    In 2011, Sanford Brown College, Inc. ("SBC") and California School of Culinary Arts, Inc. ("CSCA"), both owned and operated by CEC, were sued for making

---

[5] In 2011, CEC agreed to pay $40 million to settle a class-action lawsuit where former students claimed they had been duped the California Culinary Academy, a CEC owned for-profit secondary school, that represented to students that 97% of its graduates obtained jobs.

fraudulent representations to prospective students.

138.    The allegations against SBC and CSCA involved, among other things, representing to prospective students that they would be assisted with finding full-time employment, that the placement rates of their programs was 100%, that graduates of their school would earn salaries and/or hourly wages in excess of what they could realistically be expected to earn, that their schools were fully accredited and that their instructors all had the experience and competency to teach in their respective fields.

139.    CEC's practices and policies were uniformly applied to all of its for-profit secondary schools, including IADT ONLINE, as CEC manages all of its schools from the same corporate offices.

140.    As such, it is no coincidence that CEC has found itself as a defendant in the law suits described above which all allege the same fraudulent and deceptive policies and practices.

141.    The above-described misleading acts and omissions by IADT ONLINE are perpetrated methodically by IADT ONLINE pursuant to a program developed and prescribed by CEC and perpetrated at the specific direction and involvement of CEC.

142.    As a result of Defendants' unlawful conduct, including the misrepresentations and omissions of material fact alleged above Plaintiffs and the Class have been damaged by, among other things: (1) paying tuition to Defendants; (2) paying interest on student loans that Defendants had induced them to take out in order to pay tuition; (3) being unable to find employment based on and as a result of their "education" at IADT ONLINE; and (4) having to attend other post-secondary schools and re-take classes that they had already taken at IADT ONLINE because credits earned at IADT

ONLINE do not transfer. Plaintiffs and the Class paid or became obligated to one or more third parties (lenders) to pay thousands of dollars, in some cases hundreds of thousands of dollars, plus significant interest thereon. In addition, Plaintiffs and the Class invested valuable months of their lives and incurred cost of living and other expenses. Plaintiffs and the Class have been damaged in other and further ways subject to proof at trial.

## CLASS DEFINITION

143. The individual Plaintiffs, RONALD CERNOHORSKY and IMONI ALI, at all times relevant to this action were students of Defendants.

144. The Class of similarly situated individuals is defined as:

*All students who are or have enrolled in Defendants' Online Degree Programs during the relevant time period.*

## TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

145. Any and all statutes of limitations are tolled by virtue of Defendants' knowing and active concealment and denial of the facts alleged herein. The Plaintiffs and Class Members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part. The Plaintiffs and Class Members could not reasonably have discovered and did not discover the unlawful tactics and/or the deceptive nature of the scheme, acts, representations, omissions, and false advertisements put forth by Defendants in order to enable them to file this action prior to its date of actual filing.

146. Defendants are and were under a continuing duty to disclose the true character, quality, and nature of its programs to the Plaintiffs and Class Members. Defendants' duty to disclose the true character, quality, and nature of its programs arises from, *inter alia*, its partial disclosure of information, its concealment of information, and its fiduciary relationship

with the Plaintiffs and Class Members who relied upon Defendants to disclose this knowledge. Defendants are therefore estopped from relying on any statute of limitations defense because of their concealment of the true character, quality, and nature of their programs.

## COUNT I

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF PURSUANT FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, CHAPTER 501, § 211(1), FLA. STAT. (FDUTPA)

147.    Plaintiffs and the members of the Class readopt and reallege the allegations set forth in Paragraphs 3 through 146 as if fully set forth herein.

148.    Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act, is to be liberally construed to protect the consuming public, such as the Plaintiff in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

149.    Plaintiffs and the Class members are "consumers" within the meaning of Fla. Stat.§501.203(7).

150.    Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

151.    While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms which have found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

152.    The federal courts have defined a deceptive trade practice to be any act or practice that has the tendency or capacity to deceive consumers and an unfair trade

practice to be any act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

153.    Defendants' acts and omissions of representing to Plaintiffs, and the members of the Class, that, among other things:

a)    A student with an information technology degree from IADT ONLINE would earn an annual salary of at least $50,000.00 up to $100,000.00;

b)    IADT's job placement rate was anywhere from 70%-90%;

c)    Teachers at IADT ONLINE were qualified to teach their respective courses and had the educational background, experience in the field, knowledge and competence to teach courses at IADT ONLINE;

d)    IADT ONLINE was an "accredited" school in which students would be able to transfer credits earned at IADT ONLINE to other schools including state or regionally accredited colleges or universities offering bachelor and graduate degrees;

e)    IADT ONLINE provided the latest, updated equipment, software and technology for students to use and students would be able to transfer those skills into the jobs they would obtain after graduation;

f)    IADT ONLINE's career services department would assist students to find jobs in their respective fields of study;

g)    IADT ONLINE is a prestigious school that carefully selects the students for enrollment at IADT;

h)    A degree from IADT ONLINE was required in order to obtain a job in the field of information technology; and

i)      Failing to disclose the true cost of obtaining a degree from IADT ONLINE constitutes both a deceptive and unfair trade practice because the false representations and omissions have a tendency or capacity to deceive consumers, such as the Plaintiff and Class members, into enrolling in IADT's programs and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

154.    As a result of Defendants' deceptive trade practices, the Plaintiffs and the Class were deceived into enrolling at IADT and incurring debts that in some cases exceed $200,000.00 and therefore, have been damaged.

155.    The materially false statements and omissions as described above were unfair, unconscionable and deceptive practices perpetrated on the Plaintiffs which would have likely deceived a reasonable person under the circumstances.

156.    Defendants were on notice at all relevant times that the false representations of material facts described in paragraph 153 were being communicated to prospective students by their employees and, in fact, rewarded their top sales people who, of necessity, were the ones making the false representations to meet their sales quota and keep their jobs.

157.    As a result of being told the false representations described in Paragraph 153, Plaintiff and the Class members have been damaged by, among other things: (1) borrowing the cost of attending IADT at high interest rates; (2) paying tuition to the Defendants; (3) paying interest, penalties, and other charges on student loans that Defendants induced them to take out to pay tuition; (4) losing time and income they otherwise would have earned; (5) incurring emotional, psychological, and related injuries; and (6) incurring severe long-term damage to their credit including, but not

limited to, their ability to obtain credit for automobile loans, additional student loans, home loans, and credit cards.

158.    Plaintiffs and the Class members have been damaged in other and further ways subject to proof at trial.

159.    Therefore, Defendants engaged in unfair and deceptive trade practices in violation of Section 501.201 *et seq.*, Fla. Stat.

160.    Pursuant to Section 501.2105(1), Fla. Stat., the Plaintiffs and the Class members are entitled to recover their fees from the Defendants.

WHEREFORE, Plaintiffs pray this Court to enter judgment against the Defendants and pray for relief as follows:

A.    A declaration that Defendants' conduct alleged herein violates FDUTPA;

B.    An injunction against Defendants under Fla. Stat. §501.211(1) and the equitable powers of the Court permanently enjoining Defendants' conduct in violation of FDUTPA;

C.    An award against Defendants for actual damages;

D.    An award for attorneys' costs and fees, as provided by Fla. Stat. §501.2105; and

E.    For such further relief the Court may deem proper and just.

## COUNT II

## UNJUST ENRICHMENT

161.    Plaintiffs and the members of the Class readopt and reallege the allegations set forth in Paragraphs 3 through 146 as if fully set forth herein.

162.    Defendants have been unjustly enriched at the Plaintiffs' and the Class'

expense by charging and collecting tuition payments from the Plaintiffs and the Class.

163.    The Plaintiffs have conferred a benefit upon the Defendants by paying monies to the Defendants by incurring debts and/or paying out of their pockets to attend IADT.

164.    Defendants have received substantial amounts of money in the form of tuition payments from the Plaintiffs and the Class and have kept those funds even though the Plaintiffs and the Class were not provided with the education and earning capacity they were promised.

165.    As such, it would be inequitable for the Defendants to retain those tuition payments without paying the value thereof to the Plaintiffs and the Class.

WHEREFORE, Plaintiffs pray this Court to enter judgment against the Defendants and pray for relief as follows:

A.    To award damages against Defendants herein for a sum of money equal to the amount of damages and/or losses that Plaintiffs have sustained or will sustain;

B.    To award prejudgment interest on the amount of damages that Plaintiffs have sustained or will sustain; and

C.    For such further relief the Court may deem proper and just.

## COUNT III

### BREACH OF FIDUCIARY DUTY

166.    Plaintiffs and the members of the Class readopt and reallege the allegations set forth in Paragraphs 3 through 146 as if fully set forth herein.

167.    Defendants owed fiduciary duties to the Plaintiffs and the Class as they

were in a position of great control and confidence over the Plaintiffs and the Class.

168.    By virtue of their unequal footing, the Plaintiffs and the Class put a great deal of faith and trust in the Defendants to be honest and forthright with them.

169.    Defendants, as providers of college and university educations, had an even greater fiduciary duty to prospective students as many of the students they marketed to, were relatively naïve and unsophisticated consumers who relied upon Defendants for crucial information they needed to make an informed decision regarding their futures.

170.    Given the tremendous amount of time and financial investment a college education entails, the Plaintiffs and the Class were in a relationship of trust and confidence with Defendants and depended upon Defendants to tell them the truth regarding, among other things, the quality of education they would receive, the financial costs of their education and their future career prospects.

171.    Defendants breached their duty to the Plaintiffs and the Class by, among other things, failing to inform them of material information they needed to make an informed decision in deciding whether to enroll at IADT, providing false and misleading placement rates of their graduates, providing false and misleading information regarding the true cost of their educations, providing false and misleading information regarding their career prospects and providing false and misleading information regarding IADT's accreditation.

172.    Plaintiffs and the Class were persons for whose benefit and guidance Defendants intended to supply the false information and intended the false information to influence the Plaintiff and the Class in deciding to enroll at IADT.

173.    As a result of Defendants' omissions of material facts, false

representations and outright lies the Plaintiffs and the Class have suffered damages.

WHEREFORE, Plaintiffs pray this Court to enter judgment against the Defendants and pray for relief as follows:

A.    To award damages against Defendants herein for a sum of money equal to the amount of damages and/or losses that Plaintiffs have sustained or will sustain; including money borrowed or paid for enrolling at IADT;

B.    To award prejudgment interest on the amount of damages that Plaintiffs have sustained or will sustain; and

C.    For such further relief the Court may deem proper and just.

## COUNT IV

## VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT, 18 U.S.C. §§ 1861-1868

174.    Plaintiff and the putative members readopt and reallege the allegations set forth in Paragraphs 3 through 146 as if fully set forth herein.

175.    Defendants form an enterprise under the RICO Act within the meaning of 18 U.S.C. § 1961 and engage in, or the activities of which affect, interstate or foreign commerce.  The fraudulent representations described above were made by Defendants to the Plaintiff and or its accrediting agencies.

176.    The fraudulent representations set forth above represented a scheme and artifice to defraud the Plaintiff, which was facilitated by use of the United States mail, email, telephones and online websites, and caused by Defendants, and resulting in mail fraud within the meaning of 18 U.S.C. § 1341.

177.    Defendants engage in and affect interstate commerce by fraudulently

marketing and distributing its products in interstate commerce.

178.    Under the RICO Act, mail fraud is defined by 18 U.S.C. § 1341, which

states in pertinent part:

> "Whoever, having devised or intending to devise any scheme or artifice to
> defraud, or for obtaining money or property by means of fraud or
> fraudulent pretenses, representations, or promises…for the purpose of
> executing such scheme or artifice…places in any post office or authorized
> depository for mail matter, any matter or thing whatever to be sent or
> delivered by the Postal Service, or…to be sent or delivered by any private
> or commercial interstate carrier, or takes or receives therefrom, any such
> matter or thing…"

179.    Defendants operated and managed the racketeering activity of mail fraud

by vastly overstating its Placement Rates to its accreditation agencies and marketed its

Placement Rates to Plaintiffs in an effort to deliberately and systematically lure students

into enrolling in its programs and used the mail to orchestrate this activity and to execute

the fraud.

180.    Under the RICO Act, wire fraud is defined by 18 U.S.C. § 1343, which

states in pertinent part:

> "Whoever, having devised or intending to devise any scheme or artifice to
> defraud, or for obtaining money or property by means of fraud or
> fraudulent pretenses, representations, or promises, transmits or causes to
> be transmitted by means of wire, radio, or television communication in
> interstate or foreign commerce, any writings, signs, signals, pictures, or
> sounds for the purpose of executing such scheme or artifice…"

181.    Defendants operate and manage the racketeering of wire fraud because it

publishes and transmits fraudulent representations using the internet and telephone to

orchestrate the fraud by reporting false Placement Rates to its accreditation agencies,

including ACICS, by, among other things, counting towards its Placement Rates

individuals employed at jobs that do not require the degree they received from IADT ONLINE.

182.    In misrepresenting its Placement Rates to prospective students, including the Plaintiff, and its accrediting agencies, Defendant intended to defraud prospective students, including the Plaintiff, and its accrediting agencies, because they knew that its Placement Rates would be relied upon by prospective students in deciding whether to attend IADT ONLINE.

183.    In furtherance of their racketeering activity Defendants have made false and misleading statements to prospective students, including the Plaintiff, and their accrediting agencies,  that concealed the fact that Defendants were inflating Placement Rates in their reports to accreditation agencies, a practice which, if corrected, would have jeopardized Defendants' ability to collect tuition payments from Title IV funding.

184.    Examples of Defendants' misrepresentations in furtherance of their racketeering activity include, but are not limited to, statements made in its 2008, 2009, and 2010 10-Ks which stated:

(1) **"We are committed to maintaining an industry-leading compliance program.**   We have developed rules, policies and standards to guide the conduct of our employees.   Our compliance objectives include the development of processes and controls to help ensure compliance with applicable rules, standards and laws.   We believe that a key to meeting these objectives is our continued emphasis on individual and organizational responsibility for compliance." 2008 and 2009 10-Ks

(2) "We place a high priority on assisting our students in graduating from their programs of study and securing employment in their careers of choice. **We believe that the gainful employment of our students in their field of study is a key indicator of the success of our schools and the fulfillment of our educations mission.**" 2008 and 2009 10-Ks

(3) "We believe that the **employment of our students in their field of study is a key indicator of the success of our schools and the fulfillment of our educational mission.**" 2010 10-K

185.    Defendants purposely failed to disclose that the Placement Rates reported to accreditation agencies and marketed to its students, including the Plaintiffs, were artificially inflated and knew that it was not complying with the accreditation agencies standards with regard to its gainful employment rate reporting and as a result, not complying with Title IV funding rules and regulations.

186.    Defendants purposely failed to disclose that the Placements Rates they were reporting and marketing were false and misleading because that would jeopardize their continuing access to Title IV funding that was essential to the Defendants' financial sustainability and survival.

187.    Plaintiffs, and the Class members, were misled by Defendants' misrepresentations of its Placement Rates and relied upon those misrepresentations in deciding to enroll at IADT ONLINE.

188.    These racketeering practices constitute a pattern under the RICO Act since they are the normal business practices of Defendants' fraudulent activities and have been throughout the Class period.

189.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs and the putative members seek "threefold the damages" suffered by Plaintiff, as well as the "cost of th[is] suit, including a reasonable attorney's fee."

190.    Plaintiffs and the putative members also seek all other equitable and legal remedies available under the RICO Act.

WHEREFORE, Plaintiffs pray this Court to enter judgment against the

Defendants and pray for relief as follows:

A.    An Order certifying the proposed Class pursuant to Fed. R. Civ. P. 23, and appointing Representative Plaintiffs, RONALD CERNOHORSKY and IMONI ALI, to represent the Class;

B.    A declaration that Defendants' conduct alleged herein violates RICO and permanent injunctive relief;

C.    An award against Defendants for compensatory and consequential damages;

D.    An award of threefold the damages sustained by the Plaintiffs and the putative members and the cost of the suit, including a reasonable attorney's fee pursuant to 18 U.S.C. § 1964(c);

E.    To award prejudgment interest on the amount of damages that the Plaintiffs have sustained or will sustain; and

F.    For such further relief the Court may deem proper and just.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for:

A.    A Declaration that Defendants have violated Florida's Deceptive and Unfair Trade Practices Act;

B.    An order designating this action as a class action pursuant to Fed. R. Civ. P. 23;

C.    An order appointing representative Plaintiffs and their counsel to represent the Class;

D.    An award of the representative Plaintiffs and the Class of reasonable attorneys' fees, costs and expenses for litigation;

E.     For compensatory and punitive damages and other statutory remedies permitted including payment of all outstanding loan balances, reimbursement for all loan payments, all tuition paid and all consequential economic damages to the Plaintiffs and Class members;

F.     Prejudgment interest;

G.     That the Court award representative Plaintiffs, RONALD CERNOHORSKY and IMONI ALI, a class action representative fee for his efforts and time dedicated to bringing justice through this action;

H.     An order directing Defendants to alter their deceptive and unconscionable business practices; and

I.     That the Court award any other legal and equitable relief as this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all questions of fact raised by this Complaint.

Dated: January 11, 2013

MITCHELL L. FELDMAN
Florida Bar No. 0080349
FELDMAN MORGADO P.A.
501 North Reo Street
Tampa, Florida 33609
Tele: (813) 639-9366
Fax: (813) 639-9376
E-mail: MFeldman@ffmlawgroup.com
Attorney for the Representative Plaintiff
and the Class